UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN MOBARAK PRADO and COMPROSUORO S.A. de C.V., <br><br> Plaintiffs, <br><br> v. <br><br> JPMORGAN CHASE & CO., <br><br> Defendant. | Case No.: 1:22-cv-7582 <br><br> **DEMAND FOR JURY TRIAL** |

### COMPLAINT

The Plaintiffs, Martin Mobarak Prado ("Mr. Mobarak") and Comprosuoro S.A. de C.V. ("Comprosuoro") bring this civil action against the Defendant, JPMorgan Chase & Co. ("JPMorgan"), and allege as follows:

### INTRODUCTION

1. This case arises from JPMorgan's documented and admitted manipulation of precious metals markets, including the market for silver, which directly and proximately caused Plaintiffs Mr. Mobarak and Comprosuoro to suffer significant financial losses and other damages.

2. Mr. Mobarak is the CEO and owner of Comprosuoro, a mining corporation that owns the Dorosa precious metals mine, located in the Sultepec mining district, Mexico.

3. In September 2020, JPMorgan entered into a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice. The DPA revealed and outlined JPMorgan's manipulation of the price of silver through spoofing and other improper trading activities. As documented in the DPA and as admitted by JPMorgan, several JPMorgan employees engaged in unlawful trading activity in order to benefit JPMorgan.

1

4. JPMorgan's manipulation of the silver market resulted in the price of silver being artificially low over several years, a market dynamic which was intended to—and did—inure to the benefit of JPMorgan.

5. JPMorgan's manipulation of the silver price proximately and foreseeably harmed silver miners and producers including Comprosuoro, which among other things was forced to halt operation of the Dorosa mine.

6. Mr. Mobarak and Comprosuoro bring this action for the damages sustained as a result of JPMorgan's unlawful manipulation of the silver market.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this matter pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiffs' claims arise under the laws of the United States.

8. The proper venue for this action is this judicial district pursuant to 28 U.S.C. § 1391, because a substantial portion of the events giving rise to the Plaintiffs' cause of action occurred in this judicial district and division. Additionally, venue is proper in this district pursuant to 18 U.S.C. § 1965(a), because Defendant's principal place of business is in this district and Defendant transacts its affairs in this district.

9. This Court has personal jurisdiction over JPMorgan, including pursuant to NY CPLR § 301 because its principal place of business is in this district.

## THE PARTIES

10. Plaintiff Martin Mobarak Prado is a Florida resident who resides in Palm Beach County, Florida.

11. Plaintiff Comprosuoro S.A. de C.V. is a mining corporation organized under the laws of Mexico with its principal place of business in Mexico.

12. Defendant JPMorgan Chase & Co. is a multinational investment bank and financial services company that is incorporated in Delaware with its principal place of business in New York City, New York. At all times relevant to this Complaint, JPMorgan, together with its subsidiaries and affiliates, was a financial institution.

## BACKGROUND

13. The Dorosa mine is located in the Sultepec mining district of Mexico. It is a privately owned precious metals mine which covers approximately 4900 acres and has existed for several hundred years. Since 1999, the mine has been owned by Comprosuoro and operated by Comprosuoro and/or its affiliates. For a period of time after Comprosuoro acquired the Dorosa mine, mining operations at the site were effectively dormant and the mine was not producing substantial quantities of silver.

14. In 2010, 2011, and 2012 the average annual closing price of silver was, respectively, approximately $20, $35, and $31 per ounce. Against that market backdrop, Comprosuoro determined that it would be viable and profitable to restart mining operations and increase silver production at the Dorosa mine.

15. Comprosuoro sought to make physical capital improvements to the mine, financing those improvements in part with capital from outside investors.

16. In 2012, the Dorosa mine completed the main improvements needed to restart mining operations. From 2012 through 2014, the Dorosa mine produced and sold considerable quantities of silver.

17. However, due to JPMorgan's illegal manipulation of the silver price, the price of silver began to fall artificially in 2013 and into 2014. In 2014, the average closing price of silver was approximately $19, and the price hit a low of approximately $15.

18. In late 2014, Comprosuoro was forced to shut down production at the Dorosa silver mine and suspended all mining development and operations because the market price of silver at the time was less than the cost to produce the silver at the mine.

## The Silver Market

19. The primary market for trading silver futures and options contracts is the Commodity Exchange Inc. ("COMEX").

20. COMEX is a division of the New York Mercantile Exchange ("NYMEX", owned and operated by CME Group of Chicago ("CME")). COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

21. At all times material, COMEX utilized the "Globex" electronic trading system, which allowed market participants to trade futures contracts from anywhere in the world.

22. The price for the silver produced at Dorosa was tied to the global market price of silver as determined through COMEX and other similar global trading platforms.

## JPMorgan's Involvement in the Silver Market

23. In late 2007 and early 2008, the Bear Stearns Companies, Inc. ("Bear Stearns") held the largest short position in both gold and silver on COMEX. Generally speaking, a market participant holding a short position stands to gain if an asset's price falls, and to lose if the price rises.

24. In early 2008, JPMorgan agreed to acquire Bear Stearns. As a result of the purchase of Bear Stearns, JPMorgan became the largest holder of short positions on silver on COMEX market.

25. Upon information and belief, the short position that JPMorgan inherited from Bear Stearns was not fully backed by physical silver either in existence or available for purchase at the time. Accordingly, JPMorgan faced significant exposure from its short position and stood to suffer financially if the market price for silver increased or remained the same.

26. Upon information and belief, having to cover a short position the size of the one that JPMorgan inherited from Bear Stearns would have jeopardized JPMorgan's financial status.

27. Because JPMorgan had such a large short position in silver, JPMorgan had the motive to manipulate the price of silver. Specifically, if JPMorgan were able to artificially suppress or lower the price of silver, JPMorgan could mitigate its exposure and potential losses on its massive short position in silver.

28. At all times material, including during the time that Mr. Mobarak, Comprosuoro, and its investors made capital improvements to restart large scale silver production at the Dorosa mine, JPMorgan, together with its subsidiaries and its affiliates, ran one of the world's largest precious metals trading businesses. Among other things, JPMorgan's Global Commodities Group employed precious metals traders who worked in offices in New York, Singapore, and London, and who operated as part of a single, cohesive global unit or "desk" (the "Precious Metals Desk").

29. As now admitted by JPMorgan in the DPA, JPMorgan engaged in unlawful manipulation of the silver market. The DPA (attached as Exhibit A) discusses in detail the deceptive and fraudulent trading tactics used by JPMorgan, its employees, and the Precious Metals Desk, including manipulating the silver market over the course of several years.

30. Among other things, JPMorgan's manipulation of the silver market operated through a combination of genuine and deceptive orders for silver and silver derivatives.

31. In tens of thousands of trading sequences, JPMorgan traders placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine Orders"). Sometimes, but not always, the Genuine Orders were "iceberg orders," meaning that other market participants could see only a portion of the order's full size at any given time. Only a pre-set portion of an iceberg order was visible at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

32. During the same trading sequences, the JPMorgan traders also placed one or more orders on the opposite side of the market from the Genuine Orders ("Deceptive Orders"). The Deceptive Orders were not iceberg orders, and so the full order size was visible to other market participants.

33. For the most part, the JPMorgan traders placed Deceptive Orders electronically using Globex. At times, however, JPMorgan traders also placed Deceptive Orders through telephone calls to floor brokers in trading pits.

34. Even prior to May 2008, certain precious metals traders at JPMorgan were trading in this unlawful manner, typically using a single large Deceptive Order that was many times bigger than the visible portion of the opposite-side Genuine Order.

35. But when JPMorgan acquired Bear Stearns in May 2008, its employees began to employ a more aggressive form of deceptive trading, making multiple Deceptive Orders at different prices in rapid succession that in the aggregate were substantially larger than the visible portion of the opposite-side Genuine Order. This new style of "layering" was more difficult both to execute and to detect than placing a single large Deceptive Order.

36. The Deceptive Orders placed by the JPMorgan traders were transmitted electronically via international and interstate wire communications from New York, London, and Singapore to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

37. In executing this scheme, the JPMorgan traders were acting within the scope of their employment as employees of JPMorgan and its affiliates, as agents of JPMorgan, and with the intent, at least in part, to benefit JPMorgan.

38. At times, the JPMorgan traders discussed their unlawful activity with each other using electronic communications such as "chats" and emails. The content of these communications is detailed in the DPA.

39. For example, on April 1, 2009, at 2:57:54 p.m., a JPMorgan trader commented to a precious metals trader at another financial services firm that "every order i do is iceberged it funny actualy i show 1 lot then when i need to get filled i will bid or offer size in front of it then boom." *See* Ex. A at A-10. Earlier that same day, the JPMorgan trader engaged in trading activity using Deceptive Orders in the same manner as he described. Specifically, at 9:29:20.263 a.m., the JPMorgan trader placed an iceberg Genuine Order to buy 17 silver futures contracts at $13.065. The JPMorgan trader was subsequently able to fill three of those contracts. At 9:29:24.529 a.m., JPMorgan placed a Deceptive Order to sell 278 contracts at $13.070 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Only 18 milliseconds later, the remaining 14 contracts in JPMorgan's Genuine Order to buy were filled. Then, 1.840 seconds after the last contract was filled, JPMorgan canceled this Deceptive Order in its entirety.

**JPMorgan's Long-Term Manipulation of the Silver Market**

40. The price of silver saw a rally between February and May of 2011 wherein the price per ounce of silver nearly doubled.

41. In April of 2011, the price per ounce of silver hit a high for 2011. During this time, JPMorgan was the largest short seller of silver on the COMEX.

42. Because of JPMorgan's large short position in silver, the substantial price increase could have caused significant financial damage to JPMorgan.

43. By the end of 2011, the price of silver was approximately half the price it was during the high of 2011.

44. JPMorgan maintained its large short position in silver, which had the potential to cause significant damages to JPMorgan should the silver price rally again in the future.

45. By engaging in deceptive trading practices and exploiting its position as one of the world's largest silver derivatives traders, JPMorgan was able to artificially suppress the price of silver and thereby mitigate the exposure caused by its short position.

46. According to recent reporting, the U.S. Government believes that JPMorgan's deceptive trades represent between 50 and 70 percent of visible silver trading during the relevant period.

**JPMorgan Enters into the DPA**

47. On September 29, 2020, the United States of America charged JPMorgan with two counts of wire fraud in relation to JPMorgan's deceptive precious metals trading strategies. That same day, JPMorgan publicly disclosed that it had entered into the DPA. Prior to the DPA, Plaintiffs Mr. Mobarak and Comprosuoro were unaware of JPMorgan's manipulation of silver prices and the silver market.

48. Pursuant to the DPA, JPMorgan agreed not to dispute facts set forth in the Statement of Facts section of the DPA. Indeed, prior to the DPA, JPMorgan publicly denied or otherwise refused to admit its involvement in the manipulation of the price of silver.

49. JPMorgan hid and concealed its manipulation of the silver market from the public, from Plaintiffs, and from other participants in the silver market until it admitted such manipulation in the DPA.

50. In 2022, a federal jury in the Northern District of Illinois convicted two former precious metal traders at JPMorgan of fraud, attempted price manipulation, and spoofing as part of a market manipulation scheme that spanned over eight years and involved thousands of unlawful trading sequences.

51. These two former metal traders are Gregg Smith, an executive director and trader on JPMorgan's precious metals desk in New York, and Michael Nowak, a managing director who ran JPMorgan's global precious metals desks.

### Artificially Depressed Silver Prices Results in Damages to Comprosuoro

52. In April of 2011, silver was trading at approximately $50 per ounce.

53. In 2013, the price of silver began to rapidly drop. By the end of 2013, the price was $20 per ounce. In 2014, silver had another double-digit price drop.

54. Upon information and belief, this price drop was at least partly the result of JPMorgan's concerted efforts to manipulate the silver market and artificially suppress silver prices to relieve the financial exposure from its short position in silver.

55. With the decreasing prices, the cost of producing the silver at the Dorosa mine would risk exceeding the market price of silver. Therefore, operating the mine could only be done at a substantial loss unless the price of silver stabilized and returned to its prior price levels.

56. In late 2014, Comprosuoro shut down production at the Dorosa silver mine and suspended all mining development and operations because the market price of silver at the time was less than the cost to produce the silver at the mine.

57. The halting of silver production at the Dorosa mine as well as the repayments made to investors as a result of artificially suppressed silver prices have damaged Plaintiffs Mr. Mobarak and Comprosuoro.

58. The sales from the silver at the Dorosa mine were based on and directly tied to the global market price of silver. As a direct, proximate, and foreseeable result of the market price manipulation by JPMorgan, producers of silver including plaintiffs suffered significant financial losses.

59. Mr. Mobarak and Comprosuoro did not know, and could not have known, by the exercise of reasonable diligence about JPMorgan's price manipulation until JPMorgan revealed and admitted to such manipulation in the DPA in 2020.

60. At all times material, JPMorgan was a significant trader in the physical, futures, and options markets for silver. Accordingly, JPMorgan had the ability to influence the market price of silver and exploited that ability through the use of deceptive trading prices including but not limited to the conduct admitted in the DPA.

### COUNT I: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962

61. Plaintiffs re-allege and incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62. During the relevant time outlined above and in the DPA, JPMorgan conducted and participated in an illegal enterprise through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme

to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

63.     As outlined in the DPA, JPMorgan admitted that several of its employees used mail and wire communications as part of a scheme to manipulate the price of silver and send out false price signals to market participants for the benefit of JPMorgan. As further outlined in the DPA, JPMorgan accepted responsibility for the actions of these employees. These employees and JPMorgan constituted an enterprise engaged in a pattern of racketeering activity.

64.     The RICO enterprise and its unlawful activities affected interstate and foreign commerce, namely the global market for silver.

65.     Among other things, the enterprise's activities affected interstate commerce because JPMorgan's employees conducted the unlawful manipulative trades on global electronic trading platforms including COMEX and impacted the market for silver and silver derivatives, a market which extends across interstate and international boundaries. Moreover, the trading done by JPMorgan impacted Plaintiff Comprosuoro, a silver miner located in another country, and upon information and belief, many similarly situated silver producers.

66.     The members of the RICO enterprise had a common purpose: to manipulate the price of silver and therefore to make money for JPMorgan and/or avoid potential losses for JPMorgan.

67.     The RICO enterprise concealed its actions and unlawful conduct from the public and Plaintiffs until these actions were publicly disclosed and admitted through the DPA. Plaintiffs did not discover and could not with reasonable due diligence have discovered the existence of the RICO enterprise, its activities, or the enterprise's relationship to their injuries until JPMorgan admitted to the relevant conduct through the DPA in 2020.

68. Defendant shared the bounty of the enterprise, for example by profiting off the market manipulation.

69. The RICO enterprise functioned over a period of years as a continuing unit and had an ascertainable structure separate and distinct from the pattern of racketeering activity. Among other things, the enterprise consisted of collaborative networks of JPMorgan traders, including members of its precious metals trading desk, with members in New York City and other financial capitals.

70. JPMorgan knowingly participated in the RICO enterprise by allowing it to continue over several years as outlined in the DPA, with multiple high-level employees of JPMorgan having actual or constructive awareness of the unlawful conduct.

71. JPMorgan admitted to at least two acts of racketeering activity at the corporate level: two separate counts of wire fraud that occurred within the last ten years in violation of 18 U.S.C. § 1343. Both acts of wire fraud benefited JPMorgan as the profits from the fraud went directly to JPMorgan and its clients and the acts were committed on behalf of the enterprise. The two acts had similar results, purposes and methods of commission as they were conducted in the exact same way as part of the same common scheme.

72. The RICO enterprise's pattern of racketeering activity had continuity because it included thousands of similar trades executed over several years, including but not limited to 2011 and 2014. These acts were in pursuit of the same overarching scheme to benefit JPMorgan.

73. As a direct, proximate, and foreseeable result of the acts of the RICO enterprise's unlawful activities, namely the manipulation of the silver price, Plaintiffs suffered damages including but not limited to lost or suppressed profits from sales of physical silver, the loss of the

viability of the Dorosa mine, and other effects from the artificial suppression of the global market price of silver.

WHEREFORE, Plaintiffs seek compensatory and treble damages, attorneys' fees and costs, pursuant to 18 U.S.C. § 1964, and any other remedies this Court deems just and proper.

### COUNT II: VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2

74. Plaintiffs re-allege and incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

75. As outlined in the DPA, JPMorgan concealed the existence of the silver price manipulation. The nature, existence and extent of this scheme could only be discerned through access to internal emails and non-public data or through—as occurred— the DPA's ultimate public admission of this price-manipulation scheme.

76. Plaintiffs did not discover and could not with reasonable due diligence have discovered JPMorgan's manipulation scheme until JPMorgan admitted to such conduct in the DPA in 2020.

77. The global markets for silver and silver derivatives—including trading on the COMEX system—are relevant antitrust markets in the United States. As outlined in the DPA, Defendant JPMorgan, at all times material, had monopoly power in that market, including the ability to influence the price of silver.

78. JP Morgan acquired, willfully maintained, and unlawfully exercised monopoly power in the silver market by: (1) acting as one of the largest traders in and holders of silver and silver derivatives in the world; (2) acquiring a market share of about 50 to 70 percent of the relevant markets, according to the U.S. Government; (3) using that dominant position to manipulate the price of silver derivatives on COMEX and (4) profiting from their unlawful monopolization.

79. As outlined in the DPA, JPMorgan's intentional distortion of the silver market through price manipulation was an anti-competitive scheme that had and was intended to have anti-competitive effects. Among other things, JPMorgan endeavored to control, took steps to control and ultimately did control the price of silver and silver derivatives.

80. As outlined in the DPA, JPMorgan willfully acquired and exercised the power to set the price of silver through spoofing and other manipulative conduct which artificially altered the prices in the physical and futures market. JPMorgan intended to manipulate the global price for silver, and as a necessary pre-requisite for doing so, needed to acquire the power to artificially manipulate the silver price. JPMorgan willfully acquired such power, including through its spoofing trades and by acquiring a market share of 50 to 70 percent in the markets for certain silver derivatives.

81. JPMorgan's price manipulation had a demonstrable effect—the very effect intended by JPMorgan—on the price of silver.

82. Plaintiffs belong to an identifiable class of individuals and entities—silver producers—that were directly injured by movements in the global silver prices caused by JPMorgan's manipulative trading. The nature and amount of Plaintiffs' losses as a result of JPMorgan's manipulation of silver prices are readily ascertainable and not speculative. Identifying and apportioning Plaintiffs' damages would not be prohibitively difficult and would not lead to duplicative damages.

83. Even if JPMorgan had not possessed or acquired actual monopoly power, it attempted to monopolize the markets for silver and silver derivatives by engaging in anticompetitive conduct through its unlawful trading practices, doing so with a specific intent to

manipulate the prices in those markets, and doing so with a dangerous probability of actually achieving its aims and accomplishing monopoly power.

84. During all times material, JPMorgan abused its dominant position in the silver market by artificially suppressing the prices.

85. Plaintiffs were unable to transact at ordinary, fair and non-artificial market prices due to JPMorgan's illegal, monopolistic conduct in artificially suppressing the price of silver.

86. At all times material, Plaintiffs were selling silver and were thus injured as a direct and foreseeable result of JPMorgan's unlawful, monopolistic conduct.

WHEREFORE, Plaintiffs seek actual damages, attorneys' fees and costs, and any other remedies this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.


Dated:  September 6, 2022                    Respectfully submitted,

                                            **PODHURST ORSECK, P.A.**
                                            Counsel for Plaintiff
                                            One Southeast 3rd Avenue, Suite 2300
                                            Miami, Florida 33131
                                            (305) 358-2800/ Fax (305) 358-2382

                                            By: */s/ Pablo Rojas*
                                                 PABLO ROJAS
                                                 New York Bar No. 5700919
                                                 projas@podhurst.com